## THE RICHMOND. THE CITY OF BERKELEY. LOVELAND v. UNITED STATES et al.

(District Court, E. D. Pennsylvania. June 23, 1922.)

No. 30.

Salvage ⬤⇒30—Services rendered to stranded steamship.

An award of $5,000, made to a tug, worth $35,000, for services rendered to a steamship, worth, with cargo, $2,500,000, stranded on the New Jersey coast, where she was in danger of being driven further ashore and being obliged to lighter cargo; the only effective service rendered by the tug being in carrying out the steamship's stream anchor and standing by for 14 hours. until she pulled herself free at high tide.

In Admiralty. Suit for salvage by one Loveland, owner of the tug Richmond, against the United States, owner of the steamship City of Berkeley, and the United States Grain Corporation, owner of her cargo. Decree for libelant.

Lewis, Adler & Laws, of Philadelphia, Pa., for plaintiff.

George W. Coles, U. S. Atty., and Conlen, Brinton & Acker, all of Philadelphia, Pa., for defendants.

THOMPSON, District Judge. This is a libel against the Berkeley and her cargo for salvage services rendered by the Richmond on

March 9, 1920. The Berkeley is a steel steamship, and is about 9,400 tons dead weight capacity, 402½ feet long, 53 feet beam, and 32 feet depth of hold. She was built in 1919 for the United States Shipping Board.

On the afternoon of March 8, 1920, she was off the New Jersey coast on a voyage from San Francisco to New York with a cargo of 9,056 short tons of flour, when she received orders by wireless to proceed to Philadelphia, and thereupon at about 3:30 p. m. changed her course for the Delaware Breakwater. After dark, her master mistook a Northeast End light for the Five Fathom Bank lightship, and, while maneuvering for a pilot, mistook for a signal from a pilot boat a flare-up light, intended by the Coast Guard Station for a warning signal. He stopped his vessel, again went ahead, and ran aground at 9:56 p. m. about a mile offshore just above Cold Spring Inlet.

Learning from the Coast Guard crew that there were no tugs or lighters available, and that nothing could be done toward pulling the vessel off that night, the captain of the Berkeley endeavored to get the Coast Guard crew to run out an anchor upon a surfboat, which was refused.

The Richmond is a steel tug, 88 feet long, and of about 450 horse power, equipped with hawsers, pump section hose, heavy towing bitts, and carrying a crew of 10 men. On the evening of March 8, being on her way from New York to Philadelphia, she had put into Cold Spring Inlet because of the high wind and sea. On the morning of March 9, the captain of the tug discovered the Berkeley aground and went to her assistance. At the request of the captain of the Berkeley, the Richmond took a hawser from the port quarter of the Berkeley and pulled on the vessel for an hour or more. There was some sea and some wind blowing inshore against the Berkeley, and the services of the Richmond in the endeavor to pull the Berkeley off were futile.

The captain of the Berkeley then requested the captain of the Richmond to run out a stream anchor weighing 3,000 pounds. About 11 o'clock the Richmond came up to the port quarter of the Berkeley, bow on. The stream anchor was swung out upon a boom over the side and let down upon the bow of the Richmond. The Richmond backed away against the tide and wind, turned, ran out to the length of the hawser, and dropped the anchor under direction of the captain of the Berkeley. The Richmond then took a hawser from the Berkeley and pulled, while the Berkeley pulled upon the anchor with her winches. These operations continued for an hour, until prevented by the ebb tide. The Richmond then went to Lewes, Del., returned about 7 p. m., and stayed by until the Berkeley, with the assistance of the stream anchor, pulled herself off about 9:45 p. m. on the flood tide.

While the tug Bethany arrived before the Berkeley got off, and the tug Arabian also went to her assistance, neither of them assisted in pulling the vessel off, owing to the darkness and the condition of the wind and sea that night. The only assistance rendered the Berkeley, therefore, was that of the Richmond. Nothing was actually accomplished through the efforts of the Richmond, except through the carry-

ing out of the stream anchor. The testimony is convincing that without the stream anchor the Berkeley would not have been able to get off when she did. She was lying, bow on, at right angles to the shore.

It was shown by the testimony of members of the Coast Guard and others familiar with the locality that the bottom where she was lying was of quicksand, alive when the tide was running in, and dead·when running out. The effect of this, necessarily, would be to cause the vessel to settle deeper in the sand or to be carried farther inshore. By continually taking up the slack of the hawser with her winches, the Berkeley was held by the anchor and prevented from going further inshore, and at flood tide at night was able to get off by hauling on the hawser and by running her propeller astern.

That the Berkeley was in a position of peril, unless she were promptly gotten off, I do not doubt. That her master realized the danger, and his need of assistance, is evident from wireless messages he sent, asking for tugs and lighters. The immediate risk to which she was subject, unless assisted through the laying of the anchor by the Richmond, was not total loss of the vessel or the cargo, but the risk of damage to the vessel incident to the strain caused by the position in which she lay and damage to her cargo through lightering and loss of freight. If she had not had the stream anchor laid, she would inevitably have been carried further inshore before wrecking crews could arrive to lighter her cargo and pull her off, and the longer she lay the greater the risk and danger. There was no storm, and, while there was a ground swell and a wind against the vessel, there was nothing in the testimony to indicate any severity of weather or unusual conditions. A wrecking crew from New York or Philadelphia could have arrived upon the scene in 24 hours, so that there was no imminent, immediate risk of destruction of the Berkeley or her cargo.

We will next consider the risk incurred by the Richmond. While taking the anchor from the Berkeley aboard required skill and seamanship in preventing the Richmond from being thrown against the Berkeley, and while there is always some risk that tackle may break, which in this case would have resulted in the anchor damaging the Richmond's deck, yet such occurrence is not usual, and there is nothing to show that it was a hazard out of the ordinary, or that the weather conditions rendered it specially hazardous. That the service was rendered with skill and efficiency is apparent.

It is contended by the respondents that the anchor could have been taken out on the ship's lifeboats, and various witnesses have described how it could have been done by lashing two lifeboats together with spars and suspending the anchor between the two boats. If this could have been done, it is remarkable that the master of the Berkeley did not avail himself of the use of his own boats, rather than engage the services of the Richmond. There was, according to the testimony, enough sea to keep the Richmond tossing, and it is doubtful if the power of the lifeboats would have been sufficient to carry the anchor out in the manner described. That this theory is an afterthought is apparent from the fact that it was not done, and that meanwhile the

captain of the Berkeley was sending wireless messages for assistance from tugs and lighters.

The evidence shows that the Richmond was engaged in all for 14 hours in assisting and standing by the Berkeley. From the evidence I find that the value of the tug was $35,000. It was stipulated between counsel that the Berkeley was valued at $1,640,000, the cargo at $917,-816, and the freight at $154,335. As has been stated, this is not a case in which there was any immediate risk of a total loss. The services rendered by the Richmond, however, enabled the Berkeley to get off without damage to her hull, and without damage to the cargo by lightering and consequent loss of freight.

Taking into consideration, therefore, the value of the Richmond and the extent of her risk, and the saving of damage to the Berkeley, her cargo, and freight, and taking into consideration the other elements heretofore discussed, I am of the opinion that $5,000 is adequate compensation for the service rendered, having due regard to the encouragement of those rendering salvage services.

A decree for that amount, with costs, may be submitted accordingly.